IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
SENIOR JUDGE WALKER D. MILLER

Civil Action No. 07-cv-00945-WDM-MEH

SAN LUIS VALLEY ECOSYSTEM COUNCIL,
CITIZENS FOR SAN LUIS VALLEY - WATER PROTECTION COALITION,

      Plaintiffs,

v.

U.S. FISH AND WILDLIFE SERVICE,

      Defendant;

LEXAM EXPLORATIONS (USA), INC.,

      Intervenor Defendant.

---

## FINDINGS AND ORDER ON PLAINTIFFS' REQUEST
## FOR PRELIMINARY INJUNCTION

Miller, J.

      This case is before me on Plaintiffs' Motion for Preliminary Injunction (doc no 65). An evidentiary hearing in this matter was held on May 20, 2009. I have read the parties' written arguments and considered the evidence submitted with the briefs and offered at the evidentiary hearing. For the reasons that follow, Plaintiffs' motion will be granted and a preliminary injunction shall issue.

### Background

      This is a dispute concerning the U.S. Fish and Wildlife Service's alleged failure to comply with the National Environmental Policy Act ("NEPA") in connection with its management duties over oil and gas activities on the Baca National Wildlife Refuge (the "Refuge").

Congress authorized the establishment of the Refuge on November 22, 2000 to help protect the "unique hydrological, biological, educational and recreational values" of Colorado's San Luis Valley. 16 U.S.C. § 410hhh-4.  In March 2009, Congress again addressed the Refuge stating that the purpose is to "restore, enhance, and maintain wetland, upland, riparian, and other habitats for native wildlife, plant and fish species in the San Luis Valley."  Omnibus Public Land Management Act of 2009, § 6201(1)(a)(2). In administering the Refuge, USFWS is required, to the maximum extent practicable, to "emphasize migratory bird conservation" as well as "broader landscape conservation efforts."  *Id.* § 6201(2)(c)(2).

The San Luis Valley is predominantly rural with an economic base driven by agriculture, recreation and tourism.  Final EA at 3-45, G-28 (Town of Crestone Comments); G-5 (EPA Comments); G-6 – G-9 (National Park Service Comments).  The USFWS's Conceptual Management Plan (2005)("CMP") describes the existing unique and exceptional natural features of the Baca NWR.

> Authorized in 2000, the Baca National Wildlife Refuge is one of the largest and most recent additions to the National Wildlife Refuge System. The refuge, at 92,500 acres, is located in Saguache and Alamosa counties in the San Luis Valley of south-central Colorado (figure 1). Congress authorized acquisition of land within the refuge with passage of Public Law 106-530, also known as the "Great Sand Dunes National Park and Preserve Act of 2000." This legislation, which received widespread support, focused not only on protecting the region's hydrology, which the incredibly unique sand dunes ecosystem depends upon, but also at protecting the exceptional ecological, cultural, and wildlife resources of the area.
>
> Situated in the San Luis Valley, a high mountain desert surrounded by two 14,000 foot mountain ranges, the refuge contains a highly diverse suite of habitats including desert

2

shrublands, grasslands, wet meadows, playa wetlands, and riparian areas. Fed largely by melting mountain snow, numerous streams crisscross the refuge providing an abundance of life in an otherwise arid landscape. The refuge is home to a multitude of wildlife and plant species, some of which only occur in the San Luis Valley.

Adding to the uniqueness and importance of the refuge is its juxaposition to other conservation lands in the area. The refuge abuts lands owned or controlled by other conservation entities including The Nature Conservancy (TNC), the National Park Service (NPS), the USDA Forest Service (USFS), and the Colorado State Land Board (SLB). This complex of lands, totaling more than 500,000 acres, contains one of the largest and most diverse assemblages of wetland habitats remaining in Colorado.

In addition to the incredible plant and animal resources contained on the refuge, the area is also tremendously rich in cultural resource sites, some of which date over 12,000 years ago. Many of these sites have been added to the National Register of Historic Places.

Plaintiffs' Ex. 27 (Full Copy of CMP) at S-1 (describing "uniqueness and importance of the refuge"), at S2, 5 ("unique landscapes"), at 16 ("unique hydrological characteristics" and "rare or unique amphibian species"), 19 ("unique playa wetlands"), 31 ("unique and complex hydrological and geomorphological setting").

In establishing the Refuge, however, the United States obtained only the surface rights, not the severed mineral interests.  The mineral rights in the disputed area (54,000 acres referred to as the Baca Ranch) are owned by Intervenor Lexam Explorations (USA), Inc. ("Lexam").  Lexam owned the mineral rights before the government's acquisition of the property and entered into a surface use agreement with the previous surface owner; the United States took its interest subject to this agreement. The surface use agreement apparently will expire in 2011.

3

In 2006, Lexam submitted a development proposal to the USFWS.  USFWS determined that the procedural requirements of NEPA do not apply to USFWS decisions regarding private parties' use and occupancy of the Refuge for purposes of accessing and developing privately held mineral estates.  Negotiations between the USFWS and Lexam then resulted in a special use permit, approval of conditions and mitigation measures for geophysical explorations, and other approvals of Lexam requests without the benefit of NEPA analysis.  Consistent with its proposal, Lexam carried out three-dimensional seismic exploration in the Refuge in February 2007.  Lexam now proposes to drill two development wells and to run production tests to see if the wells could be commercially feasible.  Overall, the access, construction, and proposed drilling will affect approximately 14 acres of the Refuge; the total project is expected to last 180 days, including approximately 75 days of drilling.  Defendant and Lexam worked jointly to obtain the necessary permits from the Colorado Oil and Gas Conservation Commission ("COGCC").  The COGCC issued the permits to drill on April 3, 2007.  Various terms and conditions were imposed by the COGCC and other agencies, including the Rio Grande Water Conservation District, the Baca Grande Water and Sanitation District, and Saguache County.  Lexam and Saguache County also entered into an agreement on April 17, 2007, which addressed road signage, payments by Lexam in the event County road weight limitations were exceeded and chemical testing of drill cuttings prior to disposal at county landfills.  The wells will be deep, approximately 14,000 feet, which is unusual for oil and gas wells in the area.

The present lawsuit was filed by local conservation groups in May 2007.  On November 28, 2007, I administratively closed the case (doc no 44), remanding the

4

matter to the USFWS to allow it to comply with NEPA. Beginning in the spring and summer of 2007, USFWS and ENSR, a third-party NEPA contractor, took steps toward preparation of an Environmental Assessment ("EA"). Plaintiffs charge that political interference was brought to bear on ENSR and USFWS employees who prepared the EA/FONSI, specifically from Lexam and counsel for the Denver Regional Solicitor's office. Plaintiffs' Ex. 5 (December 21 2007 email); Plaintiffs' Ex. 6 (Nov. 13 e-mails from Ron Garcia). Plaintiffs further charge that the EA analysis was based on Lexam's proposal to limit the scope of NEPA analysis.

A Draft Environment Assessment ("Draft EA") was issued on January 18, 2008. During the formal comment period, USFWS received over 2,000 comments from 415 individuals, 7 letters from federal, state, or local government agencies and over 47,500 individual comment letters stating concern and/or opposition to the proposal. Final EA Appendices at F-1 to F-8. Plaintiffs reviewed and provided detailed comments on the USFWS analysis. Plaintiffs' Ex. 3, 4. Plaintiffs and others argued that the proposed activities are significant and require a full EIS. Other common concerns included comments about the impact on groundwater quality, the "sense of place" or "uniqueness" of the area, and the adequacy of the analysis and preparation for the proposed action. Plaintiffs allege that USFWS refused a request by Saguache County for greater participation in the NEPA process and that the US Environmental Protection Agency ("EPA") determined the Draft EA was inadequate.

On October 20, 2008, USFWS issued the Final Environmental Assessment of Planned Gas and Oil Exploration, Baca National Wildlife Refuge, Saguache County, Colorado ("Final EA") and the related Finding of No Significant Impact ("FONSI").

Under NEPA, a finding of no significant impact means that no environmental impact statement need be conducted. The Final EA/FONSI examined the impacts of conditions USFWS would place on the Lexam drilling program and did not view the drilling proposal as the "federal action" under scrutiny. Final EA at F-11 (explaining that the scope of analysis did not include any analysis of impacts of alternative drilling proposals, locations, or any other alternative protective measures). As stated by the agency,

> Rather than debate the extent of the USFWS's jurisdiction to impose protective standards and measures on access to excepted mineral rights on the refuge, the USFWS has developed and Lexam has agreed to the protective standards and measures that are described in the Final EA and FONSI.

*Id.*; accord, Final EA at F-19- F-20 ("It is important to re-iterate that the federal action that provides the legal basis for this NEPA analysis is the formulation of standards and measures…").

Shortly after the issuance of the Final EA/FONSI, Plaintiffs sought to reopen the case. Doc no 48. On February 13, 2009, the parties stipulated that Lexam cease all construction activities on the Lexam Road on the Refuge, not commence construction of the relevant access roads and well pads, and remove all construction equipment from the Refuge pending determination of Plaintiff's motion for a preliminary injunction. Doc no 58. On February 23, 2009, Plaintiffs filed the current request for preliminary injunction seeking to extend the terms of the stipulation until a decision on the merits. Doc no 65. The matter is fully briefed and a hearing was held on May 20, 2009.

6

Standard of Review

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural Resources Defense Council*, 129 S.Ct. 365, 374 (2008).  In cases where the movant has prevailed on the other factors, the Tenth Circuit uses a liberal definition of "probability of success": the plaintiff need only raise "questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation."  *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir. 1980) (internal quotations omitted).[1]  A preliminary injunction is an extraordinary remedy never awarded as of right.  *Winter*, 129 S.Ct. at 376.  Rather, any right to relief must be clear and unequivocal.  *Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009).

Discussion

In their Amended Complaint (doc no 79), Plaintiffs assert the following claims for relief: (1) violation of NEPA by failing to conduct NEPA analysis before "reviewing, accepting, authorizing, approving, regulating, and/or assisting with Lexam's staking/survey activities, geophysical explorations, and other activities" on the Refuge; (2) violation of NEPA by authorizing activity during the ongoing NEPA process,

---

[1]As discussed further below, the United States Supreme Court made clear in *Winter* that all four elements must be established to justify issuance of a preliminary injunction.  However, the Tenth Circuit appears to recognize the continuing validity of the modified success-on-the-merits formula notwithstanding the *Winter* decision.  *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1209 n. 3 (10th Cir. 2009).

particularly by taking action that will "limit the choice of reasonable alternatives in the ongoing development of the Comprehensive Conservation Plan"; (3) violation of NEPA by issuing an Environmental Assesssment which failed to take a hard look at the direct, indirect, and cumulative impacts of the Lexam proposal to drill oil and gas wells in the the Refuge; (4) violation of NEPA by failing to analyze a full range of alternative courses of actions; (5) violation of NEPA by issuing a Finding of No Significant Impact despite the existence of significant impacts which require preparation of an Environmental Impact Statement; and (6) violation of NEPA by unlawfully denying Saguache County's request to participate as a "cooperating agency."

Analysis of Preliminary Injunction Factors

Addressing the four prongs of the preliminary injunction, I find and conclude as follows:

1.    Irreparable Harm

With regard to the likelihood of irreparable harm, Plaintiffs urge that pursuant to *Davis v. Mineta*, 302 F.3d 1104, 1115 (10th Cir. 2002) harm to the environment may be presumed when an agency fails to comply with the required NEPA procedure. I decline to rely on such a presumption, however, in light of the United States Supreme Court's clarification of the irreparable harm standard in *Winter*. In that case, the Court held that Ninth Circuit law permitting the issuance of a preliminary injunction in a NEPA case based on the "possibility" of irreparable harm was too lenient. 129 S.Ct. at 375. Although the Court's decision in *Winter* relied in part on the fact that significant information was already available about the impacts of the proposed federal action (Navy training exercises), the decision nonetheless makes clear that "plaintiffs seeking

preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Id.* (emphasis in the original).  This language may suggest that a presumption of irreparable environmental harm is not appropriate.  *See, e.g., Sierra Club v. United States Forest Serv.,* 593 F. Supp. 2d 1306 (N.D. Ga. 2008) ("there is no presumption entitling plaintiffs to automatic injunctive relief merely because there has been a NEPA violation," citing *Winter* and *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 544-45 (1987)).

        Even without a presumption of harm, I conclude that Plaintiffs have presented adequate evidence that the drilling of these wells is likely to cause irreparable injury to Plaintiffs' environmental and procedural interests.  It is undisputed that the Refuge contains unique resources, including sensitive wetlands, habitat for a variety of wildlife and fish, aquifers that play an important role in the wetlands and in providing water for the community, clean air, and large expanse of undeveloped land with a significant "sense of place" and quiet.  Evidence was provided from several members from the two Plaintiff organizations, all of whom live in close proximity to the Refuge and have interests in the water, wildlife, air, solitude and quiet, and natural beauty it provides.  Although the Refuge is currently closed to the public, the Plaintiffs have established that this does not affect many of these interests and that they fully intend to visit the Refuge if they can get permission in the near future or after public access is again available.

        Plaintiffs provide evidence that construction will result in soil disturbance and dust, which may affect creeks and other water sources and could harm species listed under the Endangered Species Act, such as the Rio Grande sucker (fish).  Plaintiffs also argue that permitting construction activities at this time will interfere with the

9

establishment of baseline data needed before a Comprehensive Conservation Plan ("CCP") is in place.  Individual members of Plaintiffs' organizations have established that they will be affected by noise and that their aesthetic interests will be affected by the increased traffic and drill rigs.  The drill rigs are expected to operate 24 hours a day and will have bright lights that several members said they would be able to see and hear, given the anticipated location of the rigs.

In response, the government asserts that many of Plaintiffs' concerns would relate to full scale development and drilling, not to the drilling of these two exploratory wells.  It emphasizes that if commercial quantities of oil and gas are discovered, the Fish and Wildlife Service will perform a separate NEPA analysis before any further development occurs.[2]  The government contends that there will be no irreparable harm because the terms and conditions adequately protect and mitigate the impact of the proposed exploratory activities and that Plaintiffs' claims of harm are speculative.  The government also asserts that the Final EA specifically addressed issues such as sedimentation, impact on aquifers, harm to the Rio Grande sucker fish, noise and visual impacts, and effect on wildlife migrations.  The government emphasizes that Lexam's activities will be contained and temporary and that the Refuge is not as undeveloped as Plaintiffs portray it.  Lexam makes similar arguments in its response brief, noting in particular that reclamation is required after the project is completed (and thus no harm is "irreparable").

---

[2]According to statements by the government at the hearing, the two development wells will be filled and capped, even if they are productive, pending further NEPA review.

The Final EA recognizes that drilling and ancillary construction will definitely result in soil disturbance and dust, to be mitigated by watering, but which mitigation could cause additional runoff, erosion, and sedimentation.  Although the land and vegetation disturbed by Lexam's activities will be reclaimed, the EA recognizes that complete vegetation recovery will take up to 15-20 years; such a long recovery time may constitute irreparable damage.  *See Amoco Prod. Co.*, 480 U.S. at 545 ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable.").  In addition, access to one of the drill sites is over Crestone Creek, which is one of the two identified habitats for the endangered Rio Grande sucker.  Plaintiffs present evidence that the sucker is extremely sensitive to sedimentation and changes in water and that the drilling activities, if not properly mitigated, could cause irreparable harm to the species.  Plaintiffs also present evidence that the current bridge is quite dilapidated, which could mean an increased risk at the crossing site or additional construction – either option appears to entail some risk to the creek.  The wells also will go through two aquifers, including a closed aquifer that is critical in supplying water to the area. Although cement casings will be installed up to 3000 feet, Plaintiff's present evidence indicating that the closed aquifer is one of the most complex in the state and is deeper than 3000 feet in various places.  Finally, even though some of the harm to Plaintiffs' aesthetics interests and noise will be temporary, it may be irreparable in the sense that it is not compensable by money damages.  *Davis*, 302 F.2d at 1116.

This issue is intertwined with the probability of success on the merits.  As discussed infra, Plaintiffs may be likely to succeed in demonstrating that the FONSI was

not the product of an adequate EA.  Their remedy, which would be to either require to

the USFWS conduct an EIS or to cure the deficiencies in the EA, would be meaningless

if drilling were to proceed during the pendency of this litigation.  In other words, the

Plaintiffs' procedural interest in a proper NEPA analysis is likely to be irreparably

harmed if Lexam were permitted to go forward with the very actions that threaten the

harm NEPA is intended to prevent, including uninformed decisionmaking.  *See Colorado*

*Wild, Inc. v. United States Forest Serv.,* 523 F. Supp. 2d 1213 (D. Colo. 2007) ("the

irreparable injury threatened here is not simply whatever ground-disturbing activities are

conducted in the relatively short interim before this action is decided, it is the risk that in

the event the Forest Service's [decisions] are overturned and the agency is required to

'redecide' the access issue, the bureaucratic momentum created by Defendants'

activities will skew the analysis and decision-making of the Forest Service towards its

original, non-NEPA compliant access decision."); *see also Save Strawberry Canyon v.*

*Dep't of Energy*, 613 F.Supp.2d 1177, 1187 (N.D. Calif. 2009) ("There is no doubt that

the failure to undertake an EIS when required to do so constitutes procedural injury to

those affected by the environmental impacts of a project.") (citing *Lujan v. Defenders of*

*Wildlife*, 504 U.S. 555, 572 & n. 7 (1992) and acknowledging the burden to demonstrate

likely irreparable harm under *Winter*).  Even if Plaintiffs ultimately prevailed, the

challenged action would most likely be complete before a decision on the merits in this

action, meaning that alternatives would be foreclosed and the environmental harm

would already be inflicted.

    2.   <u>Balance of the Equities</u>

    I conclude that the harm identified by Plaintiffs, including the likelihood of

irreparable environmental injury and the risk of uninformed decisionmaking regarding such delicate and intertwined natural resources, outweighs any potential harm accruing to Defendants.  The USFWS has not identified any specific injury that will result from the issuance of a preliminary injunction, which will serve only to maintain the status quo pending review.  The government argues that data and information obtained from Lexam's activities will be useful in developing the CCP, but provides no elaboration. Any delay from obtaining such information does not appear to be a compelling interest compared to Plaintiffs' identified harms.  Lexam's harm, delay in drilling the exploratory wells, is not irreparable in that it can be compensated by money damages.  Accordingly, I conclude that the balance of the equities weigh in favor of granting the preliminary injunction.

    3.   <u>Public Interest</u>

Plaintiffs argue that preserving the environment is a strong public interest.  Also, the thousands of comments from the public opposing the drilling demonstrates that the public interest favors the injunction.  Plaintiffs further note that other government agencies, such as the EPA and Saguache County, commented that the EA was flawed and inadequate to truly evaluate the impact of the proposed activities and that meaningful participation in the process enhances the public interest.

The government responds that the Refuge is not undeveloped but rather was previously the subject of extensive mineral exploration and was used for cattle and hay cultivation.  The government finally argues that since there is no likelihood that Plaintiffs will succeed on the merits, there is no public interest in preventing Lexam's activities.

I conclude that the injunction sought by Plaintiffs is not adverse to the public

13

interest.  As noted in *Colorado Wild*, "[t]he public has an undeniable interest in the
[government's] compliance with NEPA's environmental review requirements and in the
informed decision-making that NEPA is designed to promote."  523 F. Supp. 2d at 1223.
Moreover, the large volume of public comments submitted on the Draft EA also
indicates that there is a public interest in maintaining the status quo pending proper
review.  *Id.*  The mere fact that there has been some exploration and previous
agricultural use of the Refuge prior to the acquisition by the United States does not
demonstrate that an injunction maintaining the status quo is adverse to the public
interest.

     4.     <u>Likelihood of Success on the Merits</u>

     The merits of this case are governed by NEPA.  NEPA requires agencies "to
consider environmentally significant aspects of a proposed action, and, in so doing, let
the public know that the agency's decisionmaking process includes environmental
concerns."  *Utahns for Better Transportation v. United States Dep't of Transportation*,
305 F.3d 1152, 1162 (10th Cir. 2002).  Specifically, agencies are required to take a
"hard look" at the environmental consequences of a proposed action where the action
could have a significant effect on the environment.  *Id.* at 1162-63.  An EA is a
document that, under NEPA, provides "sufficient evidence and analysis for determining
whether to prepare an environmental impact statement or a finding of no significant
impact."  40 C.F.R. § 1508.9(a).  If the environmental assessment results in a finding of
no significant impacts, an EIS is not required.  40 C.F.R § 1508.13.  An agency must
generally prepare an EIS if the environmental effects of a proposed action are highly
uncertain.  *Nat'l Parks & Conservation Assoc. v. Babbitt*, 241 F.3d 722, 731 (9th Cir.

2001).

Whether a proposed action will have a significant effect on the environment requires consideration of two factors: context and intensity.  40 C.F.R. § 1508.27. Context refers to the scope of the proposed action, including the interests affected.  40 C.F.R. § 1508.27(a).  Intensity concerns such factors as (1) beneficial and adverse impacts; (2) effect on public health or safety; (3) unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, wetlands, or ecologically critical areas; (4) the degree to which the effects are likely to be highly controversial (i.e., disputed); (5) the degree to which the effects on the environment are highly uncertain or involve unique or unknown risks; (6) the degree to which the action may establish a precedent for future actions; (7) whether the action is related to other actions with individually insignificant but cumulatively significant impacts; (8) the degree to which the action may adversely affect districts, sites, or other places listed in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources; (9) the degree to which the action may adversely affect an endangered or threatened species or its habitat; and (10) whether the action threatens a violation of federal, state or local law or requirements imposed for the protection of the environment.  40 C.F.R. § 1508.27(b).

Since this is an action pursuant to the APA, the Plaintiffs must ultimately show that the agency's process was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1573-74 (10th Cir. 1994).  This generally involves a review of the agency's decision-making process to determine whether "the agency examined the relevant data and articulated a

15

rational connection between the facts found and the decision made." *Id.* at 1574. An agency decision will be considered arbitrary and capricious "if the agency relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (citations omitted). I conduct a plenary review of the record to determine whether the agency's action was supported by substantial evidence. *Id.* at 1576. My review has a substantive component with respect to the ultimate conclusion of no significant impact as well as a review of the agency's procedural compliance. *Davis*, 302 F.3d at 1112. In *Davis*, the Tenth Circuit held that where the defendants had prejudged the NEPA issues, less deference was owed to the ultimate decision. *Id.*

Plaintiff's complaint focuses on the following issues:

     a.    <u>Federal Action</u>

The first issue is whether the USFWS should have conducted a NEPA analysis in the early stages of the proposal, including before permitting Lexam to conduct seismic testing. Before litigation, the USFWS apparently took the position that Lexam's activities did not amount to a "federal action," which is the trigger for a federal agency to use the NEPA procedures.

Plaintiffs have provided persuasive authority that the government's actions in granting access to the surface estate for the purpose of exploiting the mineral estate is a federal action under NEPA. *Sierra Club v. United States Dep't of Energy*, 255 F. Supp. 2d 1177 (D. Colo. 2002). *Sierra Club* involved a split estate, with the DOE

owning the surface estate.  My colleague former Chief Judge Babcock ruled that the DOE's granting of an easement to permit a mining company to build a road to access a gravel mining site did not fall under any of the relevant exclusions for NEPA review, particularly where access roads had no independent purpose or utility apart from the overall project.  255 F. Supp. 2d at 1183-84.   Chief Judge Babcock also ruled that the review needed to consider the impact of both the mining operation as well as the ancillary road construction activities.  *Id.* at 1185.  The case also cites Colorado law for the proposition that a surface owner has the legal right to "determine how, where, and when mining can occur and ensure that the surface use is reasonable."  *Id.* at 1186 (citing *Gerrity Oil & Gas Corp. v. Magness*, 946 P.2d 913, 933-34 (Colo. 1997). Therefore, "[a]rmed with discretionary authority to determine reasonable use of the surface estate, which is a National Wildlife Refuge, DOE must comply with NEPA concerning the development of the mining operation."  *Id.*; *see also* 50 C.F.R. § 29.32 (where mineral rights on National Refuge property are owned by third parties, the owner "shall, <u>to the greatest extent practicable</u>, conduct all . . . operations in such a manner as to prevent damage, erosion, pollution, or contamination to the lands, waters, facilities and vegetation of the area.") (emphasis added).  Accordingly, there is some likelihood of success in showing that the agency acted arbitrarily and capriciously in refusing to apply NEPA before this litigation was initiated.

Once a federal action exists, the NEPA process must analyze not only the direct impacts of a proposed action, but also the indirect and cumulative impacts of past, present, and reasonably foreseeable future actions.  *Custer County Action Ass'n v. Garvey*, 256 F.3d 1024, 1035 (10th Cir. 2001) (citations omitted).  Plaintiffs contend that

the EA and FONSI were arbitrary and capricious because the agency arbitrarily limited the scope of the analysis to the effect of the standards and guidelines it negotiated with Lexam, rather than the full scope of the proposed drilling project. The Final EA expressly states that analysis did not include comparative impact of alternative drilling proposals, locations, or certain alternative protective measures. In this regard, Plaintiffs have at least raised "questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation," which is a sufficient showing if Plaintiffs establish the other factors needed to justify the issuance of a preliminary injunction.

      b.   <u>Hazardous Materials</u>

With respect to the substance of the Final EA and FONSI, Plaintiffs raise several issues regarding the adequacy of the process. Plaintiffs contend that the NEPA analysis was flawed in its treatment of hazardous materials because the Final EA did not identify the materials that will be introduced, did not provide quantities, time materials would be on site, and did not analyze risks associated with transporting such materials to the site and hauling them away as wastes. Plaintiffs point to EPA materials that identify the types of drilling fluids often used in these circumstances, many of which could pose hazards to the water resources should there be spills.

In response, the government and Lexam note that the Final EA recognizes that hazardous wastes will be a factor in the project, primarily from drill mud but also from drilling fluids and construction materials. The Final EA provides that Lexam must use a closed loop drilling system, placing all fluid and drill cuttings in tanks to be then transported and disposed off-site. Lexam expects to use water-based drilling fluids

unless unforeseen conditions are present.  In addition, Lexam is required to keep all chemicals in a central site, to maintain a data file of all materials to be used, to use catch pans and liner systems, to follow all federal and state regulations regarding transportation and storage of hazardous materials, and will be required to create a spill prevention control and countermeasure plan as well as a stormwater management plan. Defendants also contend that the OGCC has extensive regulations concerning waste management, which will govern the operations, and that the project will have a full time trained environmental monitor.  Lexam will be required to make improvements on the Crestone Creek bridge, which it apparently contends is sufficient to ensure that no spills will occur in the creek.  Lexam argues that Plaintiffs' evidence amounts to speculative, worst-case scenarios, which is not the applicable standard of a NEPA analysis.

In short, the USFWS and Lexam do not dispute that the use of hazardous materials in the project could potentially have a significant effect on the Refuge, but contend that the mitigation measures are adequate to prevent harm to the water, wildlife, and other delicate Refuge resources.

An agency's decision to forego issuing an EIS may be justified by the adoption of appropriate mitigation measures.  *Nat'l Parks and Conservation Assoc.*, 241 F.3d at 733-34.  The proposed mitigation measures must be developed to a reasonable degree; a perfunctory description or mere listing of mitigation measures, without supporting analytical data, is not sufficient to support a finding of no significant impact.  *Id.* at 734 (citations omitted).  In other words, "[w]hen the adequacy of proposed mitigation measures is supported by substantial evidence, the agency may use those measures as a mechanism to reduce environmental impacts below the level of significance that

19

would require an EIS." *Nat'l Audobon Society v. Hoffman*, 132 F.3d 7, 17 (2d Cir. 1997); *cf., O'Reilly v. United States Army Corps of Engineers*, 477 F.3d 225, 234 (5th Cir. 2007) (where "feasibility of the mitigation is not self-evident" district court did not err in determining that EA did not provide rational basis for determining that agency had complied with NEPA). The Tenth Circuit has noted that mitigation measures may be relied on for a finding of no significant impact if they are imposed by statute or regulation or submitted by an applicant or agency as part of the original proposal, i.e., the mitigation measures must be mandatory. *Davis*, 302 F.3d at 1104.

I conclude that Plaintiffs have met their burden to show that they are likely to prevail on the merits with respect to this aspect of the EA, or, at a minimum, have raised "questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." In issuing the FONSI, significant mitigation measures, including a spill prevention control and countermeasure plan as well as a stormwater management plan, were not even developed, much less evaluated. This is inadequate to demonstrate that the decision to rely on such measures is supported by substantial evidence.[3] In addition, it is unclear from this record whether the agency really evaluated the efficacy of many of the proposed safeguards, including the use of a closed loop drilling system. The Final EA

---

[3]This is true of many other aspects of the EA, which states in many places "impacts to _____ are expected to be minimal because of USFWS protective measures." See, e.g., Final EA at 4-19 (concerning impacts to wildlife and fisheries). However, many protective measures are simply described in vague terms relating to future actions, such as "Impacts to sensitive habitat, wildlife, or other sensitive natural resources features will be avoided while constructing the access road and well pads." Protective Measure #4 Final EA at 2-1.

also provides that Lexam will use water-based drilling fluids unless unforeseen conditions are present; there is no discussion of what materials might be used if such conditions are present, what hazards they might pose, and on what basis the agency has concluded that these will not have a significant effect on the delicate resources of the Refuge, including the aquifers.  Plaintiffs have presented evidence that the aquifer is highly complex, that there is a risk of breaking subterranean barriers, and that such deep oil wells are unusual in the area.  This suggests that the impact of the drilling and use of drilling fluids are uncertain or involve unique or unknown risks, which again could demonstrate significance.  In addition, although the proposed mitigation measures include monitoring of surface and ground water, it is unclear what will happen in the event that pollution or sedimentation is detected, including whether such responses would be mandatory and what authority the environmental monitors would have to take action.  Given these omissions, I conclude that Plaintiffs are likely to prevail on the merits of demonstrating that the agency's actions were arbitrary and capricious.

    c. <u>Reasonable Range of Alternatives</u>

   Plaintiffs also assert that they are likely to prevail on the question of whether the government considered a reasonable range of alternatives, providing evidence that it and others provided numerous alternatives to the proposal (including alternative drilling sites, drilling one well instead of two, development of water runoff management plans, and elimination of diesel or chemical drilling practices).  The agency, however, did not acknowledge these proposals and essentially construed its alternatives as prohibiting all drilling, permitting drilling with no conditions, or permitting drilling with the conditions agreed to by the parties.  Plaintiffs also argue that the agency did not really consider the

21

possibility of acquiring Lexam's mineral rights as an alternative, as evidenced by the Final EA's boiler plate and incomplete statement on the subject, lacking even an analysis of the likely cost of acquisition. Finally, Plaintiffs argue that the agency's refusal to permit Saguache County to participate as a cooperating agency was arbitrary and capricious, as it was apparently based on the agency's position that "the process is too far along" to permit the County to work on the issue.

The government and Lexam argue that the government validly rejected other alternatives and note that several changes were made to relocate the well sites from wetlands areas and to reroute access. The options considered and rejected included: (1) halting all drilling until a CCP was developed, which was rejected as unnecessarily stringent given the small area affected; (2) directional drilling, rejected as more problematic than vertical drilling; (3) drilling one well instead of two, rejected as inadequate for Lexam's purposes; and (4) denying all access to the surface, rejected as amounting to an unlawful taking of Lexam's property.

The objectives of the project are key guidelines in deciding whether an agency has adequately identified and considered all reasonable alternatives. *Colorado Wild,* 523 F. Supp. 2d at 1226. "Where the action subject to NEPA review is triggered by a proposal or application from a private party, it is appropriate for the agency to give substantial weigh to the goals and objectives of that private actor." *Id.* (citation omitted). "Nevertheless, an agency may not 'define a project so narrowly that it forecloses a reasonable consideration of alternatives.'" *Id.* (citation omitted). In addition, alternatives need not be studied if they are "remote, speculative . . . impractical or ineffective." *Davis,* 302 F.3d at 1121.

I agree with Plaintiffs that the way the agency framed the choices meant that the result was practically predetermined.  Prohibiting all drilling was not addressed in any meaningful way because the government took the position that it could not do this; it is unclear from the record whether it meaningfully investigated the option of acquiring the mineral rights.[4]  Allowing drilling with no conditions obviously would lead to worse outcomes than the proposal worked out by the parties.  As noted above, Colorado law permits the surface owner to impose some reasonableness requirements, as does federal regulation.  The agency's refusal to consider the drilling of the exploratory wells to be the applicable federal action, thereby eliminating any alternative drilling sites or methods, may well have been arbitrary and capricious.

Plaintiffs raise additional areas in which they contend they are likely to succeed on the merits.  Because I have found adequate grounds for concluding that Plaintiffs have met this element of the preliminary injunction standard, I do not consider the remaining arguments.

5.    Standing

Lexam makes an additional argument that Plaintiffs lack standing because the Refuge is closed to the public and Plaintiffs therefore will not personally suffer any harm from Lexam's activities.  This is not persuasive.  Evidence has been presented to show that individuals, including representatives of the Plaintiff organizations, have received

---

[4]The government contends that the failure to consider acquisition of the mineral rights was not an error because no funds had been allocated for such acquisition and Lexam was not willing to sell.  However, it does not appear that there was even an evaluation of the cost of acquisition and this may be a *post hoc* justification for the failure to meaningfully examine this alternative.

permission to go on the Refuge; it is clear that Plaintiffs intend to continue to seek permission in the future and will use the Refuge as soon as it is open to the public. In addition, Plaintiffs have presented evidence showing that the noise and aesthetic injury from the drill rigs and increased traffic will be a direct injury to several of the individual members of the Plaintiff organizations, as the drill rigs and roads are likely to be visible outside the boundaries of the Refuge. Finally, I note that the affected aquifer apparently provides water for residents in the area, including Plaintiffs, and thus any contamination or other harm to the aquifer would directly affect the Plaintiffs. In addition, as noted above, Plaintiffs have a procedural interest in proper NEPA analysis. I am satisfied that Plaintiffs have standing to pursue this litigation.

      6.   <u>Bond</u>

Plaintiffs assert that no bond is necessary and Defendants do not raise any serious arguments to contest this. In these circumstances, I have discretion to not require security. *Coquina Oil Corp. v. Transwestern Pipeline Co.,* 825 F.2d 1461, 1462 (10th Cir. 1987). I conclude that the declarations establish that the imposition of substantial security would impede Plaintiff's access to judicial review and therefore will not require a bond.

Accordingly, it is ordered:

1.     Plaintiffs' motion for a preliminary injunction (doc no 65) seeking an extension of the parties' stipulation (doc no 58) until the merits of the case are decided is hereby GRANTED.

2.     Defendant USFWS is enjoined, pending the outcome of these proceedings or further order from the Court, from taking or approving any

action would upset the status quo on the Baca National Wildlife Refuge as it existed in 2006 before Lexam sought to use and occupy the Refuge for purposes of developing the mineral estate.

3.    Specifically, Defendant USFWS is enjoined, pending the outcome of these proceedings or further order from the court, from implementing or relying on the Final EA/FONSI.

4.    The preliminary injunction does not require a bond.

5.    No part of this order should be read to bar the USFWS from carrying out all other management activities unrelated to the Lexam proposal.

6.    If not already done, in order to minimize delay to Intervenor, the Defendant shall file a complete Administrative Record within thirty (30) days after the entry of this Order and a Status Conference shall be held within ten (10) days after the filing of the record for purposes of establishing a scheduling order.

7.    This injunction is binding upon the parties to this action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise.

DATED at Denver, Colorado, on September 3, 2009.

BY THE COURT:


s/ Walker D. Miller
United States Senior District Judge